[Cite as *Vassil v. Gross & Gross, L.L.C.*, 2011-Ohio-1920.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 94919

## LAWRENCE W. VASSIL

PLAINTIFF-APPELLANT

vs.

## GROSS & GROSS, LLC, ET AL.

DEFENDANTS-APPELLEES

JUDGMENT:
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-688844

BEFORE:   Kilbane, A.J., Boyle, J., and Rocco, J.

RELEASED AND JOURNALIZED:   April 21, 2011

**ATTORNEYS FOR APPELLANT**

Mark I. Wallace
Jeffrey J. Lauderdale
Molly A. Drake
Calfee, Halter & Griswold L.L.P.
1400 KeyBank Center
800 Superior Avenue
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEES**

Timothy T. Brick
Monica A. Sansalone
Katheryn J. McFadden
Julie L. Juergens
Gallagher Sharp
6th Floor- Bulkley Building
1501 Euclid Avenue
Cleveland, Ohio 44115

MARY EILEEN KILBANE, A.J.:

{¶ 1}   Plaintiff-appellant, Lawrence Vassil, appeals from the order of the trial court that granted summary judgment to defendants-appellees, Gross & Gross, LLC and attorney Robert Gross (collectively referred to as "Gross"), in Vassil's action for legal malpractice. For the reasons set forth below, we reverse and remand for further proceedings.

{¶ 2}   On March 31, 2009, Vassil filed this complaint against defendants for legal malpractice in connection with the review of documents related to the sale of his industrial

cleaning companies to State Industrial Products ("SIP"). Vassil alleged that in 2005, he owned the assets of Quality Cleansing Agents, Inc. ("Quality") and ILMC, Inc. In late 2005, Hal Uhrman, owner and chairman of SIP, contacted Vassil about purchasing the assets of Quality and ILMC, as well as Burns Chemical Systems, Inc. ("Burns"), a company whose assets Vassil had the option to acquire. In 2006, Vassil provided SIP with financial documents for the companies. Vassil further alleged that he purchased Burns while it was in foreclosure, and he created Clean All Systems, LLC ("Clean All") from that company. Vassil subsequently agreed to sell the companies to SIP for $8 million dollars and become an employee of SIP.

{¶ 3} In March 2007, SIP and its counsel prepared a draft of an Asset Purchase Agreement ("APA") that set forth details of the purchases and indicated that the sellers had made certain financial statements that were "correct and complete" and were "in compliance with all federal, state, local and foreign statutes, regulations, ordinances and other provisions * * * concerning * * * pollution or protection of the environment[.]" SIP and its counsel also prepared a draft of an Employment Agreement that set forth the terms of Vassil's employment with SIP and indicated, in a cross-default provision, that SIP could terminate Vassil "for cause" if he "violated any provision of this Agreement or the Asset Purchase Agreement."

{¶ 4} Vassil hired Gross to represent him. Gross reviewed the drafts of the agreements. On March 22, 2007, Gross notified Vassil that he had some significant concerns and that he wanted to go over the draft with Vassil to determine what Vassil had specifically

agreed to. Vassil and Gross subsequently discussed the matter over the telephone. Portions of the agreements were changed. Gross raised additional concerns with Vassil, but in mid-April 2007, Vassil stopped communicating with Gross, and by April 17, 2007, SIP's general counsel dealt only with Vassil. Vassil executed the agreements on April 23, 2007, without Gross. Part of the transaction closed on that date, and a second closing was scheduled to occur on September 18, 2007.

{¶ 5} The final version of the APA contained Vassil's warranties that certain financial statements were "correct and complete," and that the companies were in compliance with pollution and environmental protection laws. The final version of the Employment Agreement contained the cross-default provision that stated that SIP could terminate Vassil "for cause" if he "violated any provision of this Agreement or the Asset Purchase Agreement."

{¶ 6} In August 2007, SIP informed Vassil that it had learned of inaccuracies in the warranties related to one of the companies and maintained that he had breached the APA. SIP indicated that under the cross-default provision, Vassil was subject to termination and it was entitled to a reduction in the purchase price.

{¶ 7} On September 1, 2007, Vassil obtained new counsel, and on October 4, 2007, his new counsel entered into a "Standstill Agreement" with SIP and also agreed that Vassil would be placed on paid leave. On November 30, 2007, SIP filed a claim for arbitration under the terms of the APA, asserting that Vassil had breached representations and warranties

set forth in the APA. SIP also sought a declaratory judgment that "Vassil's breach of the [APA] constitutes cause for his termination."

{¶ 8} On December 10, 2007, Vassil filed a response to the arbitration claim and a counterclaim seeking a declaratory judgment that he did not breach the APA and that any termination by SIP would be without cause. He asserted that he had purchased one of the companies from a foreclosing bank and told SIP that the company and its records were in disarray. The second closing occurred as scheduled, but SIP placed $1,750,000 of the purchase price into escrow pending the outcome of the arbitration.

{¶ 9} The arbitrator heard the matter in March 2008. On April 2, 2008, the arbitrator concluded that "no evidence shows that Mr. Vassil or Clean All intentionally provided incorrect data for the purpose of misleading claimant's officials." The arbitrator determined, however, that "the evidence shows that Acquisition is entitled to recover $196,562 for environmental cleanup and waste inventory disposal * * * and $4,670 for unpaid personal property taxes[.]" The arbitrator ruled that SIP was entitled to a $216,169 reduction in the purchase price, and that SIP could terminate Vassil "for cause" under the cross-default provision of the Employment Agreement. SIP terminated Vassil the following day.

{¶ 10} On March 31, 2009, Vassil filed this action against defendants, alleging that Gross had committed legal malpractice by failing to properly advise Vassil about the cross-default provision, by allowing it to be included in the final agreement, and by permitting the APA to include inaccurate warranties.

{¶ 11} On May 4, 2009, Gross filed an answer in which he denied liability and asserted, inter alia, the statute of limitations as an affirmative defense. Gross asserted that the matter was not filed within one year of the termination of the attorney-client relationship or the claimed cognizable event in which SIP asserted that Vassil had breached the financial and environmental warranties.

{¶ 12} In opposition, Vassil maintained that his claim for relief did not accrue until the arbitrator upheld the cross-default provision of the APA that authorized SIP to terminate Vassil "for cause" if he "violated any provision of this Agreement or the Asset Purchase Agreement." On March 3, 2010, the trial court granted Gross's motion for summary judgment.

{¶ 13} Vassil now appeals and assigns the following error for our review:

**"The trial court erred in granting the motion for summary judgment filed by defendants-appellees, Gross & Gross LLC and Robert Gross."**

{¶ 14} With regard to procedure, we note that appellate review of a trial court's grant of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241. Civ.R. 56(C) provides that before summary judgment may be granted, a court must determine that "(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party."

{¶ 15} The moving party carries the initial burden of providing specific facts that demonstrate its entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 1996-Ohio-107, 662 N.E.2d 264. If the movant fails to meet this burden, summary judgment is not appropriate. Id. On the other hand, if the movant does meet this burden, summary judgment is only appropriate if the nonmovant fails to establish the existence of a genuine issue of material fact. Id.

{¶ 16} With regard to the substantive law, we note that R.C. 2305.11(A) sets forth the limitations period in this case and provides that "[a]n action * * * for malpractice * * * shall be commenced within one year after the cause of action accrued * * *." This period begins to accrue on the happening of a "cognizable event" or termination of the attorney-client relationship for that particular transaction, whichever occurs later. *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398 (*Zimmie II*). Thus, it is the latter of these two dates that is controlling.

1. Cognizable Event

{¶ 17} In *Zimmie II,* the Supreme Court held that a cognizable event is that event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney.

{¶ 18} Further, in *Zimmie II*, as in this matter, the court was asked to determine the accrual date of the client's claim for malpractice in connection with the drafting of a document

(an antenuptial agreement that failed to contain a schedule of assets). Zimmie's attorney prepared the antenuptial agreement and mailed copies of it to Zimmie and his bride-to-be, Kathryn, on May 28, 1963. The agreement referred to schedules of assets that Kathryn and Zimmie were to exchange, but the schedules were never drafted. Zimmie and Kathryn signed the antenuptial agreement prior to their wedding, and Zimmie then delivered the signed agreement to his attorney on the morning of the wedding. No further action was ever taken with regard to the preparation of the schedule of assets, and in December 1977, Kathryn filed for divorce. See *Zimmie II*; *Zimmie v. Calfee, Halter & Griswold* (Dec. 10, 1987), Cuyahoga App. No. 52353 (*Zimmie I*). Zimmie's attorney then concluded that it would be better if an attorney outside its firm represented Zimmie in the divorce. *Zimmie II.*

{¶ 19} Thereafter, on October 13, 1981, in the first phase of proceedings on the issue of the validity of the antenuptial agreement, the trial court found that neither party was bound by the agreement's terms and provisions. The court concluded that Zimmie did not fully disclose his financial situation to Kathryn prior to execution of the antenuptial agreement, so Kathryn did not have full knowledge of his financial situation and did not voluntarily execute it. *Zimmie II.* On February 3, 1983, this court affirmed this ruling. The Supreme Court also affirmed on June 13, 1984.

{¶ 20} On June 7, 1985, Zimmie filed a legal malpractice action against his attorney and the attorney's firm. The defendants moved for summary judgment and maintained that the action was barred by the statute of limitations. In opposition, Zimmie argued that the

action was timely, since it was filed within one year of June 13, 1984, the date the Ohio Supreme Court ruled that the antenuptial agreement was invalid. *Zimmie I.*

{¶ 21} The trial court held that the claim for relief accrued on October 13, 1981, the date on which the domestic relations court invalidated the antenuptial agreement. This court affirmed.

{¶ 22} The Ohio Supreme Court also affirmed, and stated:

> "In this case, we find that the cognizable event whereby Zimmie discovered or should have discovered that he was injured by appellees' action and was put on notice of his need to pursue his possible remedies against appellees was on October 13, 1981, when the trial court invalidated the antenuptial agreement. At that time, Zimmie should have realized that the property he brought into his marriage would not be protected from his wife Kathryn in the divorce proceeding, i.e., his monetary exposure in the divorce would be greater since the antenuptial agreement was invalid. When the trial court held that the antenuptial agreement was invalid, Zimmie was put on notice of his need to pursue further remedies against appellees, who had drafted the agreement." *Zimmie II.*

{¶ 23} In concluding that the claim for legal malpractice accrued in 1981, this court and the Supreme Court did not accept earlier possible dates, such as the 1963 delivery of the incomplete antenuptial agreement, Kathryn's December 1977 divorce complaint that challenged the antenuptial agreement, or the 1977 refusal of his attorney to represent him in the divorce because of the faulty antenuptial agreement. Instead, the court determined that the cognizable event whereby Zimmie was put on notice of his need to pursue his possible remedies against them was the date on which he was "appreciably and actually damaged," i.e., October 13, 1981, the date the trial court invalidated the antenuptial agreement. Although the

validity of the antenuptial agreement had been at issue for several years prior to that date, the claim for relief did not accrue until the court struck down the antenuptial agreement.

{¶ 24} This ruling comports with earlier decisions which have held that it is not the possibility or remote chance that there has been malpractice that causes the claim for relief to accrue, but rather an actual adverse ruling that may constitute the cognizable event. For example, in *Vagianos v. Halpern* (Dec. 14, 2000), Cuyahoga App. No. 76408, this court held that the possibility or remote chance that malpractice has occurred does not constitute a cognizable event. This court stated:

> "[T]he mere assertion of a defense does not establish that the defense has any merit, much less that counsel's substandard representation is responsible for the availability of the defense. If the defense were ultimately rejected, there surely would be no reason to treat its mere assertion as a cognizable event. To rule otherwise would result in a flood of unnecessary complaints filed by clients who, in order to preserve their right to file, felt compelled to sue their former attorneys every time an affirmative defense suggested the possibility of malpractice. *A possibility or remote chance is not equivalent to a cognizable event.*" (Emphasis added.) Id., citing to *Cutcher v. Chapman* (1991), 72 Ohio App.3d 265, 594 N.E.2d 640 (cognizable event when trial granted summary judgment on statute of limitations grounds). See, also, *Wisecup v. Gulf Dev.* (1989), 56 Ohio App.3d 162, 565 N.E.2d 865 (plaintiff's claim against his employer did not accrue until the IRS decided not to redetermine the income tax, even though the plaintiff knew his employer had over-reported his income to the IRS for six years prior to the IRS decision); *Lowe v. Cassidy* (Nov. 3, 1994), Franklin App. No. 94APE06-784 (cognizable event when jury returned an adverse jury verdict); *Wozniak v. Tonidandel* (Oct. 1, 1998), Cuyahoga App. No. 73086 (plaintiff's action against defendant for malpractice accrued upon jury's finding that plaintiff had concealed and embezzled probate assets).

{¶ 25} We recognize, however, that this rule is not applied where the record demonstrates that the plaintiff discovered or should have discovered that his injury was related

to his attorney's act or omission and the client is put on notice of the need to pursue possible remedies against the attorney. *Szabo v. Goetsch*, Cuyahoga App. No. 88125, 2007-Ohio-1147 (plaintiff's claim for relief accrued when he attended oral argument in the court of appeals and learned that the failure of plaintiff's counsel to serve and/or attach a certificate of service to his responsive pleadings had subjected those pleadings to being stricken); *Burzynski ex rel. Estate of Halevan v. Bradley & Farris Co., L.P.A.,* Franklin App. No. 01AP-782, 2001-Ohio-8846 (where record demonstrated that plaintiff was aware that his claims would be time-barred if not filed by the end of January 1998, cognizable event occurred on July 10, 1998, when he learned that the opposing party had asserted the statute of limitations as a defense).

{¶ 26} Applying the foregoing, we conclude that this matter is analogous to *Zimmie I* and *Zimmie II.* The cognizable event occurred on April 2, 2008, the date on which Vassil discovered or should have discovered that he was injured by Gross's alleged action or omission and was put on notice of his need to pursue his possible remedies against Gross. This was the date on which the arbitrator concluded that SIP "may terminate the employment of Larry Vassil 'for cause' under the terms of their Officer's Employment Agreement[.]" Just as Zimmie's receipt of the separation agreement without the required schedule of assets was insufficient to constitute a cognizable event, Vassil's receipt of the APA and the Employment Agreement with the cross-default provision was insufficient to constitute a cognizable event.

{¶ 27} Moreover, although SIP informed Vassil in August 2007, that there were inaccuracies in the financial and environmental warranties and that it intended to terminate him for cause, this was insufficient to trigger accrual of the malpractice claim because Vassil was not appreciably and actually damaged at that point. *Zimmie II.* The possibility or remote chance that the cross-default provision would be deemed enforceable and operate to cause a price reduction and Vassil's loss of employment is not equivalent to a cognizable event. *Vagianos.*

{¶ 28} Further, the record indicates that Vassil proceeded with the arbitration because he believed that SIP had acted in bad faith in claiming that the cross-default provision had been breached. After his new counsel executed the "Standstill Agreement," "everything was going to be handled through the arbitration." At this point, there was simply the assertion of a defense and a possibility or remote chance that malpractice had occurred. Although the bonus was not paid, this is insufficient to constitute a cognizable event because the bonus was only a mere possibility under the agreement and Vassil still received his full salary per the APA. The undisputed facts of record indicate that after claiming "just cause for termination" under the cross-default provision, SIP put Vassil on paid leave and awaited the arbitrator's decision in order to determine whether Vassil could be terminated. SIP did not terminate Vassil because it believed that there was a risk that they would have to pay him his salary for the remaining portion of the agreement if it were subsequently determined that SIP acted without just cause in claiming that the cross-default provision term was violated.

{¶ 29} By executing the standstill agreement that placed Vassil on paid leave pending the results of arbitration, the parties acknowledged that the enforceability of the termination clause was uncertain. It was not until the actual adverse ruling from the arbitrator upholding this provision that the cognizable event occurred.

2. Termination Date

{¶ 30} With regard to the termination date, we note that an attorney-client relationship is consensual in nature, and the actions of either party to the relationship can affect its continuance. *Brown v. Johnstone* (1982), 5 Ohio App.3d 165, 167, 450 N.E.2d 693.

{¶ 31} In this matter, the record establishes that in September 2007, Vassil obtained new counsel for this transaction. The dissent notes, however, that Vassil stopped communicating with Gross in April 2007. According to the dissent, this is the point at which the attorney-client relationship was terminated. Since we have concluded that the cognizable event occurred on April 2, 2008, well after the termination of the attorney-client relationship, and it is the latter of such occurrences that establishes the accrual date under R.C. 2305.11(A), it is the April 2, 2008 date that is controlling herein.

{¶ 32} The assignment of error is well taken.

{¶ 33} By application of *Zimmie I* and *Zimmie II*, and as a matter of law, Vassil's claim for relief did not accrue upon Vassil's receipt of the APA and the Employment Agreement containing the cross-default provision for termination for "just cause." Further, SIP's statement that it intended to terminate Vassil for just cause under the cross-default

provision was insufficient, as a matter of law, to trigger accrual of the malpractice claim because Vassil was not appreciably and actually damaged at that point. *Zimmie II*. It was not until April 2, 2008, the date of the adverse ruling from the arbitrator upholding the cross-default provision, that the cognizable event occurred. Moreover, although the attorney-client relationship for this transaction terminated no later than September 2007, it is the latter date that determines the accrual of the claim for relief. *Zimmie II*. Therefore, since Vassil filed this action within one year of the April 2, 2008 accrual date, the trial court erred in concluding that this matter is barred by the statute of limitations. The judgment of the trial court is reversed and the matter is remanded for further proceedings.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

———————————————————
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

MARY J. BOYLE, J., CONCURS;
KENNETH A. ROCCO, J., DISSENTS (SEE SEPARATE DISSENTING OPINION)

KENNETH A. ROCCO, J., DISSENTING:

{¶ 34} I respectfully dissent from the majority opinion's disposition of this appeal. I would affirm the trial court because I believe Vassil's claim against Gross was neither substantively sustainable nor timely-filed.

{¶ 35} A review of the record in this case demonstrates Vassil was an experienced businessman who thought he did not need an attorney to handle his business affairs. When SIP approached Vassil about buying the enterprises in which Vassil had an interest, Vassil prepared the financial statements for the companies himself. He did not request Gross's assistance, and Vassil knew that the warranties he provided to SIP were "inaccurate."

{¶ 36} After Vassil agreed with SIP on the purchase price, Vassil ostensibly employed Gross, but permitted SIP's attorneys to draft both the purchase agreement and the employment agreement. Both Vassil and his SIP counterpart wanted the process expedited; the difference was only that SIP was willing to pay its attorney, whereas Vassil was not. The record demonstrates SIP duly sent copies of the drafts to Gross, and Gross reviewed them.

{¶ 37} On March 22, 2007, Gross sent Vassil an email that indicated he had taken a look at the agreements "and they raise some significant concerns." Gross further indicated he needed to "sit down and go over this as [he] did not know what [Vassil had] agreed to at this point." Gross also asked Vassil to "get caught up with [his] balance before [Gross could] put any significant time into this deal."

{¶ 38} According to his deposition testimony, Vassil believed he had provided as much information to Gross as he needed; i.e., Vassil's main concern was the purchase price. The

record reflects he simply failed to respond to Gross's efforts to contact him. At one point, Gross managed to contact Vassil by telephone, and they discussed the SIP agreements. SIP altered certain provisions that had concerned Gross after this conversation.

{¶ 39} On April 4, 2007, Gross sent Vassil an email that informed him that Gross "still [had] not looked over all the documents" regarding the sale to SIP *because Vassil had not contacted him to review them*. Gross asked, "What do you want me to do?" Gross still remained concerned about the warranties Vassil provided, since SIP obtained "the benefit of ignorance" and since SIP had Vassil and his wife "personally" responsible for the "warranties in the agreements, not just the companies."

{¶ 40} On April 9, 2007, Gross sent another email to Vassil, stating he *still* had not heard from Vassil about the SIP "deal." Vassil had effectively terminated Gross from representation at this point. Thus, when Gross received an inquiry from SIP's attorney, William Barnett, for "comments on the agreements," Gross replied that he should contact Vassil. From that point forward, Gross received no further information from either Vassil or SIP.

{¶ 41} Vassil executed the agreements on April 23, 2007; he neither notified Gross of the closing, nor sought Gross's presence for the occasion. Nevertheless, Vassil alleged in his complaint that Gross "allowed" him to sign these documents without discussing their ramifications with him. Since Vassil never had a face-to-face consultation with Gross, however, Gross cannot be held responsible for the final product.

{¶ 42} The purchase agreement contained the warranties Vassil provided without Gross's input about the companies' financial conditions and environmental compliance. For its part, the employment agreement provided Vassil with a $250,000 annual salary and a yearly performance bonus, but contained a five-year non-competition clause and a provision known as the "cross-default."

{¶ 43} The "cross-default provision" permitted SIP to terminate Vassil "for cause" if he had violated *any provision* of the purchase agreement, including the warranties. Thus, in light of the "inaccurate" warranties Vassil provided to SIP that the purchase agreement contained, the employment agreement authorized SIP to terminate Vassil *as soon as he affixed his signature* to the documents. Pursuant to this clause, Vassil's misrepresentations meant that he could neither *obtain* any employment benefits, nor engage in work in the industry for five years.

{¶ 44} In August 2007, SIP notified Vassil that it learned of the inaccuracies. SIP claimed Vassil had breached the purchase agreement, demanded a downward adjustment of the purchase price, and asserted a right to terminate Vassil's employment agreement. Vassil, naturally, disputed SIP's right to take these actions, and on September 1, 2007, he engaged a different law firm to represent him in the matter. His new counsel obviously had to review the documents Vassil decided to sign without Gross's advice.

{¶ 45} On October 4, 2007, Vassil's new attorneys negotiated an agreement with SIP to maintain the status quo, entitled "Standstill Agreement." By its terms, the parties

recognized that a "dispute" had arisen regarding Vassil's earlier written agreements executed on April 23, 2007.

{¶ 46} Since SIP wanted to "suspend" Vassil from his employment, the "standstill agreement" provided, in part, that "Vassil *shall not report to work* until the earlier of the date when (1) a decision is rendered in the arbitration contemplated between the parties, (2) the parties settle their dispute (Emphasis added)." The record also reflects that, although SIP's second acquisition of Vassil's businesses proceeded, SIP also placed $1,750,000 of the purchase price *into escrow* in light of the pending arbitration.

{¶ 47} The arbitration proceeding took place on March 16, 2008 over a period of three days. On April 2, 2008, the arbitrator issued an opinion that SIP was entitled to a $158,000 downward adjustment of the purchase price, and, further, was entitled to terminate Vassil's employment. SIP acted on this decision the next day by firing Vassil.

{¶ 48} With this background as contained in the record, the majority opinion finds merit to Vassil's argument that his claim of legal malpractice could not have accrued until April 2, 2008, because, until SIP could actually enforce it, he was not actually "injured" by what he deems as "Gross's" failure to prevent the inclusion of the "cross-default" provision into the purchase agreement. I do not.

{¶ 49} R.C. 2305.11(A) provides that a legal malpractice claim must be commenced within one year following the date upon which the cause of action accrued. In *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398, the Supreme Court of

Ohio held that "an action for legal malpractice accrues and the statute of limitations begins to run when there is a *cognizable event* whereby the client discovers *or should have* discovered that his *injury was related to his attorney's act or non-act and the client is put on notice* of a need to pursue his possible remedies against the attorney *or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later.*" Id. at syllabus (emphasis added).

{¶ 50} Ordinarily, the determination of when the attorney-client relationship for a particular transaction terminates is a question of fact. *Omni-Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 388, 528 N.E.2d 941. However, "[t]he question of when the attorney-client relationship was terminated may be taken away from the trier of fact * * * if 'affirmative actions that are patently inconsistent with a continued attorney-client relationship' have been undertaken *by either party.*" *Steindler v. Meyers, Lamanna & Roman*, Cuyahoga App. No. 86852, 2006-Ohio-4097, ¶11, citing *Downey v. Corrigan*, Summit App. No. 21785, 2004-Ohio-2510 (emphasis added).

{¶ 51} The attorney-client relationship is consensual, thus, it is subject to termination by acts of either party. *Ruckman v. Zacks Law Group, LLC*, Franklin App. No. 07AP-723, 2008-Ohio-1008, ¶18, citing *Columbus Credit Co. v. Evans* (1992), 82 Ohio App.3d 798, 804, 613 N.E.2d 671. The court in *Ruckman* went on to observe that conduct which dissolves the essential mutual confidence between attorney and client signifies the end of the attorney-client relationship; an explicit statement terminating the relationship is not necessary.

Id., citing *DiSabato v. Tyack & Assoc. Co., L.P.A.* (Sept. 14, 1999), Franklin App. No. 98AP-1282 and *Triplett v. Benton*, Franklin App. No. 03AP-342, 2003-Ohio-5583, ¶13.

{¶ 52} In this case, the evidence showed Vassil terminated the attorney-client relationship with Gross well before he signed the SIP agreements on April 23, 2007. Vassil refused to find time to meet personally with Gross, forcing Gross to pursue him for even a telephone call, let alone the most basic of consultations.

{¶ 53} Since the record reflects Vassil handled nearly all of the negotiations with SIP on his own, Vassil could not establish Gross committed any malpractice with respect to the agreements. Indeed, Vassil's relationship with Gross had ended before the final drafts were prepared, so Gross had nothing to do with the finished product.

{¶ 54} Vassil appeared on the signing date at the offices of SIP's attorneys without counsel. When SIP's attorney Barnett commented on the fact Vassil was alone, Vassil indicated he believed by that point he did not need legal advice. On these facts, I see no genuine issue with respect to the merits of Vassil's claim of legal malpractice.

{¶ 55} With respect to the issue of the statute of limitations, Vassil testified at his deposition that he engaged the services of a different law firm on September 1, 2007. The majority opinion finds persuasive Vassil's contention he suffered no "injury" until the arbitrator ruled SIP could enforce the "cross-default" provision against him. This, despite the fact that Vassil obviously had to pay his new attorneys to prepare the "Standstill Agreement" for him. I find it insupportable both on the facts and the law.

{¶ 56} "In determining the cognizable event, 'the focus should be on what the client was *aware* of and *not* an extrinsic judicial determination. (Emphasis added.)'" *Szabo v. Goestch*, Cuyahoga App. No. 99125, 2007-Ohio-1147, ¶14, quoting from *Vagianos v. Halpern* (Dec. 14, 2000), Cuyahoga App. No. 76408. In *Szabo*, this court held that the client should have been alerted to his claim by even the *argument* that counsel had not included a certificate of service on a motion; the client's claim was not tolled until an actual trial court decision on that argument.

{¶ 57} That result is consistent with the Ohio Supreme Court's decision in *Zimmie*. Therein, the supreme court commented that, since the appellant *no longer was represented by the firm he accused of malpractice*, requiring him to wait until the underlying case was resolved would not interfere with his current attorney-client relationship. The supreme court further stated that, had Zimmie timely filed the malpractice action, he would have avoided "needless litigation," since *the trial court could have been requested to stay his legal malpractice action* until there was a final judgment in the underlying case.

{¶ 58} Several other appellate districts have followed the supreme court's directive to focus on the client's awareness rather than the ultimate legal determination. For example, in *McDade v. Spencer* (1990), 75 Ohio App.3d 639, 642-43, 600 N.E.2d 371, the Tenth District decided the appellant's malpractice claim was barred because he would have been aware of his attorney's possible malpractice when his ex-wife *filed* a contempt motion for appellant's

failure to comply with the terms of a separation agreement. The "cognizable event" in that case accrued at that time, not when the trial court ultimately *ruled* on the contempt motion.

{¶ 59} Similarly, in *Griggs v. Bookwalter*, Montgomery App. No. 21220, 2006-Ohio-5392, ¶20, the Second District noted that "the Ohio Supreme Court has never held that a party must be aware or suffer the full *extent* of his injury before there is a cognizable event triggering the statute of limitations in a legal malpractice action." (Emphasis added.)

{¶ 60} The Ninth District faced a very similar situation to the one presented in this case in *Sesto v. Perduk*, Summit App. No. 23797, 2008-Ohio-664, and stated in relevant part at ¶ 13-14 as follows:

{¶ 61} "* * * [T]he Sestos aver that their cause of action for malpractice did not accrue until March 29, 2005, when their tort claims [presented by appellees] were dismissed. Specifically, the Sestos *claim that they suffered no actual injury* from their attorneys' actions until their claims were dismissed. We disagree.

{¶ 62} "Contrary to the Sestos' assertion, 'an injured person does not need to know the full extent of the injury for an event to be cognizable. As the [*Zimmie*] court explained, it is enough that some noteworthy event, the cognizable event, has occurred which does or should alert a reasonable person that improper legal work has taken place.' (Quotations omitted.) * * *. Moreover, in a legal malpractice claim, "'*[i]njury" is not defined monetarily*; rather, it is defined in terms of notice.' * * * . 'The fact that the appellants were not aware of the

monetary amount of their injury, pending the outcome of [their] lawsuit * * *, does not toll the running on the statute of limitations.' *Mauro v. Valenti* (May 11, 1988), 9th Dist. No. 13372, at *2. The Sestos' assertion that a judgment from the trial court was required to begin the running of the statute of limitations '*would render the factual analysis called for in Zimmie and Hershberger unnecessary.* * * *

{¶ 63} "Having rejected the Sestos' argument that their claim did not accrue until their tort suit was dismissed, we must determine the date that the claim accrued. We find that as a matter of law, the latest the Sestos' claim could have accrued was December of 2004. In October 2004, both defendants in the tort suit moved to dismiss the matter on the grounds of the statute of limitations. In December of 2004, *the Sestos contacted a second attorney*, Boyle, to determine why their tort suit was not proceeding. At that time, *an examination of the filings would have revealed the error in the legal work* conducted by Perduk and Martin. We reached a similar conclusion in *Mauro*. In *Mauro*, we noted as follows:

{¶ 64} "'At the time of the earlier lawsuit against Nell Capozzoli, appellants had *retained an attorney other than* C. Ray Valenti to enforce the declaration of trust. At that point, appellants' attorney would have *examined the declaration of trust and considered its enforceability. Certainly, appellants should have been put on notice of the need for further inquiry as to the cause of any such defects* in the declaration of trust. We hold that the appellants should have become aware of Valenti's malpractice, if any, in 1981 when

*appellants' attorney was examining* the declaration of trust, as well as the other documents, in *preparation* of the lawsuit.'" *Mauro*, supra, at *2.

{¶ 65} "Similar to the plaintiffs in *Mauro*, a reasonable person would have been *placed on notice* of the alleged malpractice herein once both defendants moved to dismiss the action and a *second attorney was contacted* to check on the status of that action.   (Emphasis added; most citations omitted.)"

{¶ 66} The foregoing observations may be applied herein.   SIP's decision to enforce the cross-default provision caused Vassil to retain new counsel, who had to review the earlier agreements in order to prepare the "Standstill Agreement."   Surely, new counsel noticed any legal problems posed by the cross-default provision: by the terms of the agreement they negotiated with SIP, Vassil was placed on involuntarily employment leave.   As Vassil's deposition testimony makes clear, he certainly viewed his enforced leave as an injury.

{¶ 67} Recently, in *Jackson v. Greger*, Montgomery App. No. 23571, 2010-Ohio-3242, the Second District observed at ¶25-26:

{¶ 68} "[The] problem with requiring judicial decisions to be the 'cognizable event' is that the statute of limitations could be almost indefinitely extended, since parties could claim lack of injury until after they had exhausted the last possible resort for appeal.   The Supreme Court of Ohio *rejected this idea* in *Zimmie* * * *.

{¶ 69} "The Supreme Court of Ohio held that [Zimmie's] malpractice action was not timely, and should have been filed within one year of the 'cognizable event,' * * * th[e] event

[that] *should have made the plaintiff realize* that his monetary *exposure * * ** would be *greater*, and would have *put him on notice of the need to pursue further remedies* against his [original] attorneys.   (Emphasis added.)"

**{¶ 70}** The record in this case demonstrates Vassil certainly became *aware* of SIP's formal intent to enforce the "cross-default" clause by the time he engaged new attorneys to negotiate the October 4, 2007 "standstill agreement."   He had to pay his new attorneys.   The "standstill agreement" itself documented the fact that Vassil was barred from his employment until the matter was resolved.   Vassil also expended funds to pursue the arbitration of the dispute with SIP.

**{¶ 71}** Therefore, I believe that, even if Vassil could support the elements of a cause of action for legal malpractice against Gross, which is unsupported by this record, his cause of action had accrued by September 2007.

**{¶ 72}** Consequently, in my opinion, the trial court correctly determined summary judgment for **Gross was appropriate.   I would overrule Vassil's assignment of error and affirm the trial court's decision.**